# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6536 | **DATE** | 5/5/2004 |
| **CASE TITLE** | Barbara Jack-Goods vs. State Farm Mutual Auto. Ins. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Pursuant to the attached Memorandum Opinion and Order, the defendant's motion for summary judgment (doc. # 28) is granted on all claims in plaintiff's amended complaint.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | MAY 0 6 2004 |
| | Docketing to mail notices. | date docketed |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |
| mm7 | courtroom deputy's initials | date mailed notice |

Document Number

47

JUDGE U.S. DISTRICT COURT CLERK

2004 MAY -5 PM 4:16

Date/time received in central Clerk's Office

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BARBARA JACK-GOODS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 01-C-6536 |
| vs. | ) | |
| | ) | Magistrate Judge Sidney I. Schenkier |
| STATE FARM MUTUAL | ) | |
| AUTOMOBILE INSURANCE CO., | ) | |
| | ) | **DOCKETED** |
| Defendants. | ) | |

MAY 0 6 2004

## MEMORANDUM OPINION AND ORDER

On August 22, 2001, the plaintiff, Barbara Jack-Goods, filed this action against the defendant, State Farm Mutual Automobile Insurance Company, claiming sex, race and age discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.,* 42 U.S.C. § 1981, and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* On September 26, 2003, plaintiff amended her complaint to withdraw her age discrimination claim. Defendant now has moved for summary judgment on all remaining claims (doc. # 28). For the reasons given below, the Court grants this motion.[1]

### I.

Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving parties are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248

---

[1] By consent of the parties pursuant to 28 U.S.C. § 636(c), on March 6, 2002, the case was reassigned to this Court for all purposes, including entry of final judgment (doc. ## 6-8).

(1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50; *see also Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909 (1988). In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977 (1987), and must draw all reasonable inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990).

When a material fact or a set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. The non-moving party's burden is to identify facts that are both material and genuinely disputed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324,(1986). To be material, a fact must be outcome determinative under the substantive law governing the motion. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A "genuine issue" exists when the party opposing the motion for summary judgment serves and files, pursuant to local Rule 56.1, a concise statement outlining the material facts that require denial of summary judgment, supported by citations to the evidentiary materials that support those denials (*e.g.*, affidavits, depositions, answers to interrogatories, admissions etc.). Fed.R.Civ.P. 56(c). Although the party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact, *Celotex*, 477 U.S. at 323, the non-moving party cannot rely upon the pleadings alone, but must use the evidentiary tools outlined in Rule 56.

## II.

The material facts that the parties do not genuinely dispute – and that support the entry of summary judgment for the defendant – are as follows. On or about March 16, 2001, plaintiff filed a charge of discrimination against State Farm with the Equal Employment Opportunity Commission ("EEOC"), thus satisfying the requirement of 42 U.S.C. § 2000e-5(b) and (e) for pursuing a Title VII lawsuit. Plaintiff's charge of discrimination was timely filed within 300 days after certain alleged unlawful employment practices occurred. On May 24, 2001, the EEOC issued plaintiff a Notice of Right-to-Sue with respect to her charge of discrimination. This action was timely brought within 90 days of plaintiff's receipt of the Notice of Right-to-Sue letter (Defendant's Rule 56.1 Statement of Undisputed Facts (hereinafter, "Def.'s 56.1 St. ¶ ___") ¶ 5).

### A. Plaintiff's Initial Employment with State Farm Insurance.

The defendant hired plaintiff in December 1984, at its Griffith, Indiana office. During the period immediately prior to April 1998, plaintiff served as a claims specialist in the Griffith office's personal injury department (also known as the bodily injury department). While serving in this department, plaintiff's immediate supervisor was Ellen Johnson (Def.'s 56.1 St. ¶ 7). At some point prior to April 1998, plaintiff was promoted to the position of claims specialist, also known as an MA3 (*Id.* ¶ 6).

### B. State Farm's 1998 Reorganization.

In 1998, State Farm changed its claim handling operations at the Griffith office. The claims specialists who previously handled either bodily injury or property damage claims began handling both kinds of claims. At approximately the same time, State Farm created its "Claims Central" operation. Generally, less complex claims were referred to Claims Central for handling while the

3

more complex claims remained in the Griffith office for handling. Thus, the relative complexity of the claims handled by the Griffith claims specialists increased (Def.'s 56.1 St. ¶ 8). At about this same time, more responsibility for the handling of files was given to claims specialists in the Griffith claims office. Claims specialists set their own case-handling schedules and developed their own case plans. However, supervisors continued to review the files on which claims specialists were working, as well as closed files. The more problems that a supervisor saw in a claims specialist's handling of the case, the more frequently the supervisor would review that specialist's files and the more frequently the supervisor would meet with the specialist to instruct him or her in how to improve his or her work product (*Id.* ¶ 9).

At the time of the 1998 change in claims handling operations, some employees were reassigned to different supervisors. Scott Lewis (formerly the property damage supervisor) and Ms. Johnson (formerly the personal injury supervisor) were each charged with supervising some of the employees formerly assigned to each of the departments at the Griffith office. As a result of the 1998 reorganization, as of the Spring of 1998, Mr. Lewis supervised Jeff Novorita, Tanya Bolden, Carrie Nero, Barbara Jack-Goods, and others. From the time of the reorganization forward, Mr. Lewis did not supervise Jason Miller, and was not a decision-maker with respect to Mr. Miller's employment (Def.'s 56.1 St. ¶ 10).

## C. Plaintiff's Employment From April 1998 Through December 2000.

From April 1998 through August 1998, plaintiff worked as the duty representative, assisting insureds and claimants who came to the office seeking information (Def.'s 56.1 St. ¶ 11). In July 1998, Mr. Lewis completed a review of plaintiff's work as the duty representative. This review was very positive, indicating that plaintiff "has performed [as duty representative] very well as

demonstrated by the number of compliments I have received regarding her handling of our customers in the drive-in" (*Id.* ¶12). In August 1998, plaintiff was moved back to a regular claims specialist desk, where she remained under the supervision of Mr. Lewis (*Id.* ¶ 13). In early November 1998, because Mr. Lewis was out of the office, Ms. Johnson signed plaintiff's review for Mr. Lewis, in accordance with Mr. Lewis' instructions. This review again was very positive, indicating that plaintiff "was just re-assigned from duty rep to field claims representative. Barbara is flexible [sic] and has a positive attitude in our changing times. She has excellent rapport with her agency partner and customers" (*Id.* ¶ 14).

The record indicates that Mr. Lewis began to perceive a decline in plaintiff's job performance in the fourth quarter of 1999, and that he expressed this perception and/or opinion to her in a variety of ways: through written memoranda, during personal meetings in his office, and in her performance evaluation for 1999 and 2000 (Def.'s 56.1 St. ¶¶ 15, 18 (*e.g.,* Def.'s Ex. F, at 25 and Ex. D thereto; Def.'s Ex. K ¶ 2; Def.'s Ex. F, at 32-34; Def.'s Ex. C, at 12-15; 33; Pl.'s Ex. 30)). Beginning in March 2000, Mr. Lewis began reviewing more of plaintiff's files and meeting with her more frequently to counsel her as to ways she could improve her job performance (Def.'s 56.1 St. ¶ 16). By her own testimony, plaintiff acknowledges that Mr. Lewis would discuss specific case files with her during frequent meetings in her office; in these meetings, Mr. Lewis noted areas in which he said the plaintiff had made errors or not ideally handled a case, and suggested ways in which she could have handled the case better (*Id.* ¶ 16; Def.'s Ex. C, at 333). Mr. Lewis testified that he evaluated plaintiff's files more frequently than the other MA3s under his supervision in the year 2000 (Def.'s 56.1 St. ¶ 15; Def.'s Ex. F, at 89). Plaintiff verifies this testimony with her own when she states that

"she was the only employee who was required to attend long counseling sessions or meetings with Mr. Lewis" (Pl.'s Am. Resp. to Def.'s 56.1 St. ¶ 17 (Pl.'s Dep., Def.'s Ex. C, at 250)).

Mr. Lewis's complaints about the plaintiff's job performance generally focused on what he perceived to be plaintiff's diminished responsiveness to agents, insureds and others; for example, plaintiff did not return some phone calls, delayed returning other phone calls and/or was not in the office to receive phone calls and answer questions (Def.'s 56.1 St. ¶¶ 18-19). Mr. Lewis also received complaints from agents, insureds and others regarding plaintiff's responsiveness (*Id.* ¶ 18). The plaintiff admits that she did not always immediately return certain phone calls (Def.'s Ex. C, at 504-507 (Pl.'s Dep.)). The plaintiff, however, disagrees (a) that she had "performance problems," and (b) that she made an error by not contacting an attorney on a case where State Farm ended up paying a $15,000 judgment after trial (Def.'s Ex. C, at 505-06, 507-511).

Thus, in general, the record reflects that Mr. Lewis, plaintiff's supervisor, perceived and documented deteriorating job performance by plaintiff in the fourth quarter of 1999 and throughout the year 2000. Mr. Lewis did not make any secret that this was his view, as is illustrated by the following excerpts from his written memos to plaintiff.

**March 27, 2000 Memorandum (Pl.'s Ex. 12)**. Mr. Lewis made the following comments to the plaintiff:

> I have two or three conversations over the past six months regarding complaints I have received from claimants, insureds, and agents about phone calls not being returned and you not being available for the customers or agents. . . .These instances cannot continue to occur as customer service is greatly affected by your lack of availability and phone calls not being returned. Not only is customer service impacted, but the morale of the other team members and the impositions placed upon them [also] is becoming a factor. . . .Regarding customer concerns on not being able to contact you, I have noticed your absence from the office for extended periods of time (two to three hours) quite frequently.

The memorandum also compliments the plaintiff for working "early in the morning or late in the evening" or some days (*e.g.,* "This has not gone unnoticed"), and for taking "the initiative" to purchase a cell phone to make herself more available to customers. Finally, the memorandum offers to "work with" the plaintiff "in any way possible to correct the concerns of this memo."

The plaintiff responded with her own memorandum (Pl.'s Ex. 13), expressing her disagreement with the criticisms noted by Mr. Lewis.

**June 2, 2000 Memorandum (Pl.'s Ex. 14).** This memorandum specifically describes problems perceived by Mr. Lewis with respect to certain files and certain clients. For example, Mr. Lewis cited plaintiff's delinquency in returning a phone call from policyholder Amy Brum and her failure to hire an attorney for a trial, resulting in a $15,000 judgment against State Farm. There were also medical bills in another file in excess of the claim limit, and no follow up by plaintiff. The plaintiff refused to sign this memorandum after Mr. Lewis discussed it with her.

**June 14, 2000 E-mail (Lewis to Lesley) (Pl.'s Ex. 16).** In this e-mail to Chris Lesley, a human resources person at State Farm, Mr. Lewis documents specific complaints and instances in which plaintiff did not return phone calls or follow up on business for a particular file.

**June 16, 2000 E-mail (Lewis to Letcher) (Pl.'s Ex. 17).** In this e-mail to Kevin Letcher, Mr. Lewis discusses plaintiff's third quarter performance rating in "quality claim resolution." He explains that the review/rating remained a 4, rather than a 3, despite the job performance problems he noted, because he and Lesley wanted to give plaintiff "the benefit of the doubt" even though the written statements in the review "made it very clear [plaintiff] is a border line 4" and that future problems would result in a lowered rating to 3. Mr. Lewis also wrote that he was aware that State Farm might "have to defend this later on if the worst case situation [sic] [were] to occur."

**December 12, 2000 Memorandum (Pl.'s Ex. 21)**. In this memorandum, written and received shortly before plaintiff's medical leave of absence, Mr. Lewis refers plaintiff to the March 27, 2000 conversation about responsiveness issues, and the June 2, 2000 memorandum in which he reiterated the March responsiveness issue, including plaintiff's lack of availability and timeliness of returning phone calls. Mr. Lewis also highlighted "performance concerns regarding [plaintiff's] quality claim resolution, customer satisfaction and personal effectiveness skills." In addition, Mr. Lewis pointed out two files "not handled according to Company procedures," and a fourth quarter QPR "below the appropriate level of performance in quality claim resolution, customer satisfaction, and personal effectiveness." The memorandum detailed specific problems on seven files.[2]

## D. Plaintiff's Sick Leave and Resignation.

The last day that plaintiff worked for State Farm was on or about December 15, 2000 (Def.'s 56.1 St. ¶ 14). On December 20, 2000, plaintiff's husband came into the office, dropped off some files, and gave Mr. Lewis a doctor's note indicating that plaintiff needed to take a sick leave because she was under significant stress and having palpitations (*Id.*, ¶ 25). Plaintiff was granted a sick leave and never returned to work (*Id.*, ¶ 26). On or about February 12, 2001, plaintiff sent State Farm a letter indicating that she was resigning her employment because, prior to her leave, her work environment had been hostile, nerve racking, and stress-filled. Nowhere in her letter did plaintiff suggest to any member of State Farm's management that she believed that her race or gender was

---

[2]The plaintiff does not dispute that Mr. Lewis perceived problems in her performance. The plaintiff does dispute that her performance in fact was a "problem" (Def.'s 56.1 St. ¶ 20; Pl.'s Am. Resp. ¶ 20). But, in the end, this dispute really boils down to a difference about the degree to which her performance was not perfect and the perceptions that she held versus those that her supervisor, Mr. Lewis, held regarding the significance of these performance deficits. As we explain *infra*, this dispute between Mr. Lewis's view of plaintiff's job performance and plaintiff's self-assessment of her job performance does not create a triable issue.

the reason for the treatment about which she complained (*Id.*, ¶ 27). On or about February 15, 2001, Mr. Letcher completed a memorandum which stated that plaintiff had terminated her employment because of her dissatisfaction with State Farm (*Id.*, ¶ 28). Although the December 2000 memorandum that Mr. Lewis gave to plaintiff never informed her that her employment had been or would be terminated, that memorandum did indicate that she "could be terminated" (Pl.'s Am. Resp. ¶ 29, citing Pl.'s Ex. 21).

### E. Mr. Lewis' Supervisory Style and Demeanor.

Other employees supervised by Mr. Lewis knew him to be an authoritative, by-the-book, regimented and detail-oriented supervisor. For example, there is testimony that Mr. Lewis would sometimes walk around the employees' work stations, reading their mail, faxes and messages and answering their phones. Mr. Lewis also expected his claims specialists to complete their files in a particular order and manner, and he criticized employees who did not follow this procedure to the letter (Def.'s 56.1 St. ¶ 30). The plaintiff herself testified that when she and Mr. Lewis were discussing previous management experiences, she interpreted his comments to mean that he enjoyed the "sweat shop" type of environment (Def.'s Sur-Response ¶ 32).

Two of plaintiff's fellow MA3 employees, whom Mr. Lewis supervised, also complained about him. Carrie Nero, a white female, complained that Mr. Lewis made her feel that everything she did was wrong (Pl.'s Am. Resp. ¶ 33; Def.'s Sur-Response ¶ 33). In particular, she testified that Mr. Lewis was sarcastic, spoke down to her and was overcritical of her work during frequent meetings at which they discussed her performance (Def.'s 56.1 St. ¶ 35). Jeff Novorita, a white male, stated that Mr. Lewis "was often critical of my work and claims handling, and focused on what I perceived to be insignificant oversights and problems" (Pl.'s Am. Resp. ¶ 33; Def.'s Sur-Response

¶ 33). Mr. Novorita also testified that Mr. Lewis frequently read the messages, faxes and mail on his desk and answered his desk phone (Def.'s 56.1 St. ¶ 37). Mr. Novorita further testified that Mr. Lewis counseled him and coached him to help him improve (*Id.*).

Two African-American women whom Mr. Lewis supervised, Adrienne Chumley and Gloria Woods, also testified that Mr. Lewis spoke in authoritative, condescending, sarcastic, and/or parental tones (Def.'s 56.1 St. ¶ 39). On the other hand, Tanya Bolden, an African-American woman who was an MA3 claims specialist supervised by Mr. Lewis, did not, according to plaintiff's own admission, have any performance problems; instead, she was considered by Mr. Lewis a "top-notch employee with strong potential" who did not have job performance problems; indeed, she was the very person whom Mr. Lewis suggested that plaintiff emulate (Def.'s 56.1 St. ¶ 38). The plaintiff was the only State Farm employee whom Mr. Lewis supervised who resigned (Def.'s 56.1 St. ¶ 40).

## F. State Farm's Applicable Corporate Policies.

State Farm's policy is that an employee who has notable performance problems cannot be recommended for a transfer or promotion to a position outside that area (Def.'s 56.1 St. ¶ 41). State Farm also has a widely disseminated "open door" policy. Employees are informed that they can speak to any management person at any time at any level without fear of reprisal (*Id.*, at ¶ 42). State Farm has a Code of Conduct hotline, the existence of which also is publicized to employees. This hotline connects directly to State Farm's corporate offices, and provides a means for employees to raise concerns and complaints about their workplace (*Id.*, at 43). Both the open-door policy and the Code of Conduct hotline are discussed with employees on at least a yearly basis (*Id.*).

## III.

We begin our legal analysis with Counts I and II, in which the plaintiff alleges a constructive discharge on the basis of gender and race in violation of Title VII. Under Title VII, the plaintiff must establish a *prima facie* case of discrimination before an inference of discrimination can be validly drawn and used to defeat summary judgment. Such a *prima facie* case is established by evidence showing that: (1) the plaintiff was a member of a protected class; (2) she was qualified for her position; (3) despite her qualification, she suffered an adverse employment decision by the defendant; and (4) other, similarly situated employees who were not members of the protected class were treated more favorably. *McDonnell Douglas v. Green*, 411 U.S. 792 (1973); *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975 (7th Cir. 2001). Although establishing the *prima facie* case has been described as a "low hurdle," *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir. 1994), in this case, the plaintiff has failed to clear hurdle numbers three and four.

As part of the *prima facie* case, the plaintiff must offer evidence that the adverse employment action was not the result of a failure to perform the employer's legitimate expectations. In this case, the Court will assume, *arguendo,* that the plaintiff was qualified for the MA3 position she held and that she was performing satisfactorily. The basis for this assumption is twofold: *first,* the defendant admits that it did not fire the plaintiff and would not have done so based on the performance issues reflected in the plaintiff's 1999 and 2000 job performance reviews (Pl.'s Exs. 29 and 30); and *second,* according to the reviews (QPRs), although plaintiff was performing some areas of her job very well and others not as well, her ratings never dropped below a "3" which is always descriptive of a satisfactory – even if not ideal or expected – performance.

Although the parties spend many pages disputing whether plaintiff had "performance problems," these disputes are not the crux of this case. Neither side disputes that Mr. Lewis honestly perceived that some of plaintiffs' actions and/or failures to act were job performance problems. In the Seventh Circuit, it is the decision-maker's perception of a plaintiff's performance, not her own, that is relevant. *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 398 (7th Cir. 1998). The *prima facie* case required under *McDonnell Douglas* requires the plaintiff to show that she was qualified for the position she held, but, despite this qualification, suffered an adverse employment action that was not experienced by other similarly situated persons.

Thus, the Court will move on to the central issues presented on summary judgment: (a) whether the evidence submitted would allow a jury to reasonably decide that Mr. Lewis's conduct created a working environment for plaintiff that was so intolerable that any reasonable person would have felt compelled to quit, and if so (b) whether the evidence would allow a jury to reasonably conclude that Mr. Lewis acted because of race and/or gender. We address each of these questions in turn.

## A.

An adverse employment action is defined as more disruptive than a mere inconvenience or an alteration of job responsibilities. *Traylor v. Brown,* 295 F.3d 783, 788 (7th Cir. 2002). To establish a claim for constructive discharge as the adverse employment action under Title VII, "a plaintiff must prove that his working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into involuntary resignation." *Tutman v. WBBM-TV, Inc./CBS, Inc.,* 209 F.3d 1044, 1050 (7th Cir. 2000). *See also Simpson v. Borg-Warner Automotive, Inc.,* 196 F.3d 873, 877 (7th Cir. 1999). "Working conditions for constructive discharge

must be . . . egregious . . . because in the 'ordinary' case, an employee is expected to remain employed while seeking redress." *Id.*

The determination of what a reasonable person would do in a given circumstance, although generally a question of fact, is a question the Court can decide as a matter of law in this case. The undisputed material facts in this case would not allow a jury to reasonably conclude that plaintiff's working environment was so intolerable that a reasonable person would feel compelled to resign. Seventh Circuit case law establishes that much more is needed to establish a constructive discharge than what plaintiff has offered here.

For example, in *Tutman*, the Seventh Circuit found that the statement "Get the fuck out of the office before I pop a cap in your ass[,]" interpreted by the African-American plaintiff in that case as a death threat (since "pop a cap" means "to shoot" in gang parlance), as well as a comment, "have you seen a movie entitled 'Niggers with Hats'" (a film actually entitled 'Fear of a Black Hat'), was not enough to create an egregious enough work situation for plaintiff that would establish constructive discharge. *Tutman*, 209 F.3d at 1046-1048, 1050. The appeals court explained that a credible death threat that signals grave danger to the plaintiff's bodily integrity . . . can constitute grounds for finding constructive discharge," but the kind of harassment suffered by *Tutman* fell "well short of this standard." *Id.* The Seventh Circuit thus affirmed the district court's grant of summary judgment.

Conversely, "[i]n cases finding constructive discharge, the plaintiffs suffered from much more severe and sustained harassment." *Id.* For example, in one case, the Seventh Circuit found constructive discharge when the plaintiffs' boss constantly peppered the plaintiffs with racist comments, brandished a pistol and held it to one plaintiff's head. *Taylor v. Western & S. Life Ins.*

*Co.,* 966 F.2d 1188, 1191 (7th Cir. 1992). In another case, the plaintiff established constructive

discharge where "repeated instances of grossly offensive conduct and commentary" culminated with

an incident during which a co-worker showed the plaintiff a racist pornographic photograph, told her

that she was hired to perform the task depicted in the photograph, grabbed the plaintiff and

threatened to kill her. *See Brooms v. Regal Tube Co.,* 881 F.2d 412, 417, 423 (7th Cir. 1989).

This case is not like *Brooms* or *Taylor.* Here, at most, the plaintiff experienced "boorish

behavior" by Mr. Lewis, unwarranted criticism and reviews, excessive counseling, and unjustified

increases in the amount of work she was asked to do or to correct. This kind of conduct, however,

has never been sufficient in the Seventh Circuit to create a triable issue on constructive discharge.

*See, e.g., Patton v. Indianapolis Public School Board,* 276 F.3d 334, 339 (7th Cir. 2002) (affirming

district court's entry of summary judgment for employer where rude, overbearing, critical behavior

by supervisor does not create intolerable working conditions establishing constructive discharge);

*Harriston v. Chicago Tribune Co.,* 992 F.2d 697, 705 (7th Cir. 1993) (affirming district court's entry

of summary judgment for employer where counseling and criticism were not sufficiently egregious

to constitute constructive discharge). *See also Wardwell v. School Board of Palm Beach County,*

786 F.2d 1554, 1557-58 (11th Cir. 1986) (reversing district court's entry of judgment for plaintiff

where different work assignments did not provide sufficient basis for constructive discharge).

Moreover, the complaints plaintiff made about Mr. Lewis prior to her resignation were

general in nature; none of these complaints alleged that the treatment she received from Mr. Lewis

was tied to her sex or race. General complaints about working conditions, even if the employer fails

to respond to them, do not constitute a basis for constructive discharge. *Ashkin v. Time Warner Cable*

*Corp.*, 52 F.3d 140, 143-44 (7th Cir. 1995).[3] For these reasons, plaintiff has failed to create a triable issue on whether she suffered an adverse employment action.

## B.

Plaintiff has also failed to satisfy the fourth prong of the *prima facie* case, namely, that another similarly situated employee, who is comparable to her in all material respects, but who is not in the protected class, was treated more favorably by the employer. Plaintiff points to one comparable: Jeff Novorita, a white male, who was an MA3 employee supervised by Mr. Lewis at the time of plaintiff's employment with defendant. The plaintiff argues that she was similarly situated to Mr. Novorita because Mr. Lewis held them to the same standards of performance; she says that Mr. Novorita was treated more favorably because he had lower QPR averages in 1998 than the plaintiff did in 2000, but he was not required to attend daily (and lengthy) counseling sessions with Mr. Lewis; did not have his files reviewed on a weekly basis; and did not have "drop file" memos by Mr. Lewis criticizing specific actions and mistakes made by Mr. Novorita.

There are several reasons why the Court finds that Mr. Novorita is not plaintiff's comparable for purposes of the fourth prong of the *prima facie* case. *First,* the QPR periods that plaintiff points to are different and do not reflect similar fact situations. *See Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617 (7th Cir. 2000) (employees must have similar experience to be similarly situated). The QPR period in 1998 directly followed the reorganization, during which time the case loads of all

---

[3] The plaintiff claims that "the conditions were so unpleasant it [caused] [p]laintiff to suffer from palpitations which her doctor attributed to stress" (Pl.'s Mem. at 9). However, the evidence to which plaintiff points in support of her statement merely notes her diagnosis; it does not attribute plaintiff's condition to stress, much less to workplace stress. Moreover, the legal issue is whether plaintiff has presented sufficient evidence to create a sustainable inference that a reasonable person would have found her working conditions "intolerable." The evidence that she suffered from palpitations, at most, creates an inference that plaintiff found the working conditions stressful; but, it does not permit an inference that a reasonable person would have suffered from the same malady, or that a reasonable person would have found the conditions intolerable. *See, e.g., Tutman,* 209 F.3d at 1050.

employees increased; the QPR period in 2000 occurred well after Mr. Lewis and his MA3 employees had adapted to the reorganization's demands. *Second*, there is no evidence that Mr. Lewis received customer complaints about Mr. Novorita, as was the case with plaintiff. *Third,* there is undisputed evidence that when Mr. Lewis thought Mr. Novorita made mistakes, Mr. Lewis counseled and reprimanded him, and that he did so in a similar fashion to the way he treated plaintiff.

Finally, we note that the "similarly situated" prong of the *McDonnell Douglas prima facie* test is intended to show that there is evidence which would allow an inference of discriminatory intent. On the issue of intent, there is undisputed evidence that Ms. Bolden, an African-American MA3 who was supervised by Mr. Lewis and who worked with the plaintiff, was perceived by Mr. Lewis to be a model employee. Where a similarly situated employee within the plaintiff's protected class is treated favorably, that evidence must be factored into the determination of whether plaintiff has established a "logical reason" for believing that the defendant's actions were discriminatory. *Kelly v. Apollo Travel Services Partnership,* No. 98 C 2506, 2000 WL 1170074, at *9 (N.D. Ill. August 16, 2000). The plaintiff has failed to establish such a logical reason.

We also note that for the first year or so that he supervised plaintiff, Mr. Lewis gave her quite favorable job performance reviews. Plaintiff has offered no explanation of why she received those favorable reviews, if – indeed – Mr. Lewis harbored discriminatory animus because of plaintiff's race and/or gender. To the contrary, the evidence indicates that all Caucasian and African-American employees, as well as all male and female employees, were treated with what they perceived as rudeness and criticism by Mr. Lewis when he had problems with their job performance. In particular, Mr. Novorita, a white male, also perceived that Mr. Lewis treated him with rudeness and unjustified criticism. *Harden v. S.C. Johnson & Son, Inc.,* 167 F.3d 340 (7th Cir. 1999) (no evidence

of unlawful discrimination where undisputed facts show that supervisor treated all employees with equal disrespect). Plaintiff has failed to offer evidence to create a triable issue on the fourth element of the *prima facie* test.[4]

## IV.

We now turn to Count III of the amended complaint, which asserts a claim of race discrimination under Section 1981. A claim of employment discrimination is actionable under Section 1981. *Saghvi v. St. Catherine's Hosp., Inc.,* 258 F.3d 570 (7th Cir. 2001). To prove a claim under Section 1981, the plaintiff must show: (1) that she is a member of a racial minority; (2) that the defendant intended to discriminate against her on the basis of race; and (3) that the alleged discrimination concerned an activity protected by the statute. *Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir.1996). The allegations of Count III fail to create a triable claim under Section 1981 for three reasons.

*First,* in Count III, plaintiff realleges all of the other paragraphs of the first amended complaint and then states that the alleged conduct "violated Jack-Goods' right to be protected against racial discrimination in the making and enforcement of contracts" (Am. Compl., ¶ 24). However, the preceding paragraphs of the amended complaint allege only the conduct that plaintiff claims created the constructive discharge; there are no allegations that describe or allege any other interference in the "making and enforcement of contracts." Thus, for the reasons that the

_____

[4]Constructive discharge is the only adverse employment action that the plaintiff pled in her amended complaint. However, in her summary judgment brief, plaintiff attempted to raise a "hostile work environment" theory (Pl.'s Resp. Mem. at 13-14). The hostile work environment theory fails to defeat summary judgment, not only because it has not been pled in the amended complaint, but also because the factual record in this case does not support such a claim/theory for the same reasons discussed in our constructive discharge discussion.

constructive discharge theory fails to create a triable issue under Title VII, it likewise fails to create a triable issue under Section 1981.

*Second*, we reject the plaintiff's attempt to cure this problem by arguing in her summary judgment brief that the Section 1981 claim is based on a failure to transfer (*see* Pl.'s Mem. at 14-15). There is not one word in the amended complaint about a failure to transfer (wrongful or otherwise), and a summary judgment brief filed after the close of all discovery is not the time or place for a plaintiff to attempt to amend the pleadings. Moreover, even if a transfer claim had been pled, it would be waived because she failed to raise that claim in her EEOC charge. *Cheek v. Peabody Co.*, 97 F.3d 200, 202-03 (7th Cir. 1996).

*Third*, even if plaintiff had not waived this argument, it would fail on the merits, as did plaintiff's Title VII claims, because the factual record fails to support a sustainable inference that plaintiff suffered an adverse employment action or was similarly situated with respect to others who were treated more favorably. As for the adverse employment action prong, there is case law from this district holding that a plaintiff cannot sustain a *prima facie* case for failure to transfer because such an act is not an adverse employment action. *Washington v. Thrall Car Manufacturing Co.*, 901 F. Supp. 1269-1274 (N.D. Ill. 1995). A decision from the District of Columbia Court of Appeals also recently held that a failure to transfer cannot constitute an adverse employment action unless the position requested results in greater pay or tangible benefits. *Stewart v. Ashcroft*, 352 F.3d 422 (D.C. Cir. 2003). And, as for the similarly situated prong, there is no evidence that a person outside the protected class was treated more favorably by Mr. Lewis with respect to transfer applications, in general, or the specific transfer application and/or opening in the subrogation department, that plaintiff complains about.

## CONCLUSION

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment be granted (doc. # 28) on all claims in plaintiff's amended complaint.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

Dated: **May 5, 2004**